GREENBERG TRAURIG, LLP
VINCENT H. CHIEFFO (SBN: 49069)
2450 Colorado Avenue, Suite 400E
Santa Monica, CA 90404-5524
Telephone:  310-586-7700
Facsimile:  310-586-7800
E-mail: chieffov@gtlaw.com

JAMES H. DONOIAN (Admitted *Pro Hac Vice*)
HEIDI GARFIELD (Admitted *Pro Hac Vice*)
GREENBERG TRAURIG LLP
200 Park Avenue
New York, NY 10166
Telephone: 212-801-9200
Facsimile:  212-801-6400
E-mail: donoianj@gtlaw.com

Attorneys for Defendant,
ADAPTIVE MARKETING LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| CONSUMERINFO.COM, INC., a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> ALEX CHANG, an individual; ONE TECHNOLOGIES LP, a Delaware limited partnership; ADAPTIVE MARKETING LLC, a Delaware corporation; and DOES 1-10, inclusive, <br><br> Defendants. <br><br> AND RELATED COUNTERCLAIM | CASE NO.   C-09-03783 (VBF)(MANx) <br><br> **ADAPTIVE MARKETING'S MEMORANDUM REGARDING CONSUMERINFO'S PRESENTATION OF EXPERT EVIDENCE** <br><br> Judge:  Hon. Valerie Baker Fairbank <br> Ctrm:   9 <br> Trial Date:   December 8, 2010 <br> Date Action Filed:  May 28, 2009 |

## I.      Introduction

Adaptive Marketing LLC ("Adaptive") opposes any effort by Plaintiff ConsumerInfo.com, Inc. ("CI") to present testimony by Adaptive's branding expert, Erich Joachimsthaler, as part of CI's case-in-chief prior to Adaptive electing to call him as a witness.  Adaptive similarly opposes CI's simultaneous attempt to call CI's *rebuttal* expert during its case-in-chief.  CI's presentation of Dr. Joachimsthaler's deposition testimony is untimely and grossly prejudicial, and CI cannot demonstrate any "exceptional circumstances" justifying its untimely presentation of this testimony.    Indeed, the circumstances make clear that CI's true intent is to present its *rebuttal* expert in its case-in-chief as a last ditch effort to admit scientifically unreliable consumer surveys for which there is no foundation.  Further, CI's selective portions of Dr. Joachimsthaler's *deposition*, which Adaptive merely *defended*, are incomplete, misleading, and will be confusing to the jury and prejudicial to Adaptive.

## II.     Brief Statement of Facts

CI advised Adaptive on December 15, 2010, after it provided a list to the Court of depositions it intended to play, that it intended to present Dr. Joachimsthaler's testimony as part of its case-in-chief.  While CI did file an index of transcripts reflecting designations for Dr. Joachimsthaler on December 2, 2010[1] (*see* Docket No. 588), CI did not include Dr. Joachimsthaler's transcript in the *amended* index or lodging of transcripts it provided on December 7, 2010 (*see* Docket No. 615), nor in the handwritten list CI provided at the Court's request on December 10, 2010.  CI is not entitled to call Adaptive's designated expert as part of its case-in-chief, and CI has failed to present any compelling reason why it should be so entitled.   The implication of CI's gamesmanship is clear: CI simply intends to call Adaptive's

---

[1]   At that time, these designations consisted of nearly the entire transcripts for 40 different depositions, including Dr. Joachimsthaler's full eight hour day of testimony.  *See* CI's Deposition Designations for Trial, Docket No. 451.  It would have been unrealistic to expect CI to present evidence in such a format to the jury, which explains why CI had to substantially cut down its designations for the witnesses it *actually* intended to present by deposition, which it did by amended submission on December 7, 2010.  This submission did not include Dr. Joachimsthaler's deposition.  *See* Docket No. 615.

expert *by deposition* so that CI may sneak in the *live* testimony of its *rebuttal* expert before Adaptive even opens its own case and has an opportunity to have its expert give his full opinion to the jury.

CI's subterfuge is made all the more transparent by its selective re-designation of the transcript; whereas CI originally identified nearly the *entire* 6775-line transcript to be read during trial, the re-designation consists of a scant 200 lines. The substance of the designations is all the more telling: it consists of little more than one-sided questions by CI designed to reflect incomplete answers by Dr. Joachimsthaler (*see* CI's Re-Designation of Dr. Joachimsthaler's Deposition, attached hereto as <u>Exhibit A</u>),[2] merely to open the door for CI to then *rebut* the selective testimony by introducing Carol Scott. Carol Scott, in turn, merely serves CI's narrow purpose of attempting to finally admit and/or substantiate consumer awareness surveys that have no indicia of reliability, which Carol Scott did not conduct, and of which Carol Scott has absolutely no knowledge. *See* Defendants' Joint Motion *in Limine* No. 1 to Exclude All Evidence and Argument Pertaining to Marketing and Consumer Surveys, Including Carol A. Scott's Expert Opinion  and Testimony Relying On Or Referencing Such Surveys, Docket No. 477.

### III.   Argument

Dr. Joachimsthaler has been designated as an expert witness in this case by Adaptive pursuant to Fed.R.Civ.P. 26(a)(2). The "ability of a party to call another party's expert on direct examination, while not outright impossible, must nonetheless overcome significant hurdles." *Adams v. U.S.*, No. 03-0049-E-BLW, 2009 WL 2413801, at *1 (D.Idaho Aug. 5, 2009). Once expert witnesses are retained, they remain the witness of the retaining party. *See Lehan v. Ambassador Programs, Inc.*, 190 F.R.D. 670, 672 (E.D. Wash. 2000); *see also Hammons v. Simmons*, No. 3:09CV-217-S, 2010 WL 3490994, at *1 (W.D. Ky. August 31, 2010) (noting that

---

[2] Indeed, CI's "re-designations" of its original designations of Dr. Joachimsthaler's transcript essentially cut out what little foundation CI could have possibly laid for the selective testimony of Dr. Joachimsthaler that CI now seeks to have read before the jury. *Compare* CI's original designations, Docket No. 588, with CI's revised designations, <u>Exhibit A</u>.

2

the Sixth Circuit "generally forbids a party from calling the opposing party's expert as a witness at trial, even if the opposing party does not intend to use that expert"). Adaptive, not CI, has the right to call -- or not call -- Dr. Joachimsthaler to testify at trial.  *See Lehan*, 190 F.R.D. 670, 671-672 ("each party is free to…exercise its judgment on whether or not to call the expert witness at trial").

Courts in the Ninth Circuit have held that one party may only call at trial the expert witness of the other party in "exceptional circumstances."  *See, e.g., Lehan*, 190 F.R.D. at 672 (expressly rejecting the "discretionary" or "balancing" standard from other courts such as *House v. Combined Ins. Co. of Am.*, 168 F.R.D. 236, 240 (N.D. Iowa 1996)); *FMC Corp. v. Vendo Co.*, 196 F. Supp. 2d 1023, 1046 (E.D. Cal. 2002)).  *Accord Durflinger v. Artiles*, 727 F.2d 888 (10th Cir. 1984); *Rubel v. Eli Lilly & Co.*, 160 F.R.D. 458 (S.D.N.Y. 1995); *In re Shell Oil Refinery*, 132 F.R.D. 437 (E.D. La. 1990).  When the calling party has expert witnesses of its own who can testify to the same matters, or where it could have easily retained such an expert, this does not qualify as an "exceptional circumstance."  *See, e.g. Lehan*, 190 F.R.D. at 674 (holding that because plaintiff could call other psychologists, psychiatrists, and mental health counselors that were "equally qualified to express an opinion" there were no exceptional circumstances, and thus plaintiff could not call defendant's expert to testify at trial); *FMC*, 196 F. Supp. 2d at 1046 (where plaintiff's experts did not have "unique expertise" otherwise unavailable to defendant, defendant failed to show the necessary exceptional circumstances to allow it to call plaintiff's experts at trial); *see also Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980).

CI has not -- *and cannot* -- demonstrate exceptional circumstances for presenting expert testimony from Adaptive's branding expert as part of CI's case-in-chief.  CI was well within its rights throughout discovery to retain and disclose its own expert witness on branding, or to conduct a secondary meaning survey to assess the strength of its purported trademarks.  ***CI chose to do neither***.  CI did, however, designate a *rebuttal* expert to Dr. Joachimsthaler.  Until and unless Adaptive's expert

3

testifies, a rebuttal expert is not able to offer rebuttal testimony. *Lindner v. Meadow Gold Dairies, Inc.*, 249 F.R.D. 625, 635 (D. Haw. 2008); *Johnson v. Grays Harbor Community Hospital*, No. C-06-5502BHS, 2007 WL 4510313 (W.D. Wash. Dec. 18, 2007). Rebuttal evidence "is intended **solely to contradict or rebut** evidence on the same subject matter…" Fed. R. Civ. P. 26(a)(2)(C)(ii) (emphasis added). CI is not entitled to present the testimony of its rebuttal expert prior to the introduction of testimony *to rebut* -- that is, testimony from Dr. Joachimsthaler. Likewise, CI should not be entitled to introduce Dr. Joachimsthaler's testimony merely as a backdoor to presenting testimony of its rebuttal expert, Carol Scott, during its case-in-chief. Such a tactic is essentially designed to present rebuttal evidence *affirmatively*. *See 1-800-Contacts, Inc. v. Lens.com, Inc.*, Case No. 2:07-cv-591 CW, Memorandum Decision and Order, Document 267 at *21 (D. Utah., Dec. 14, 2010) ("A rebuttal expert report is not the proper place for presenting new arguments..."). Comparing the selective portions designated of Dr. Joachimsthaler's transcript with the anticipated testimony of Carol Scott,[3] it is clear that CI is merely attempting to manufacture a "rebuttal" opportunity as a ruse to offer affirmative testimony on the strength of its trademarks. *See 1-800-Contacts*, Case No 2:07-cv-00591-CW, Document 267 at *22 ("Comparing [defendant's expert] declarations with [plaintiff's rebuttal expert] declaration, it is clear that [plaintiff's rebuttal expert] is offering affirmative testimony … rather than merely rebutting [defendant's expert] testimony."). Rebuttal evidence may not be offered merely to bolster CI's case-in-chief. *See Estate of Brutsche v. City of Fed. Way*, 300 Fed. Appx. 552, 553 (9th Cir. 2008).

Finally, CI presenting Adaptive's expert by deposition poses a serious prejudice to Adaptive and a significant risk of confusing the jury; it should be prohibited under Federal Rule of Evidence 403. As a threshold matter, Adaptive defended Dr. Joachimsthaler's deposition and, therefore, did "not flush[] out the

---

[3] According to CI's witness list, "Dr. Scott will testify concerning FREECREDITREPORT.COM marketing and advertising, consumer awareness of FREECREDITREPORT.COM, and Adaptive Marketing's marketing and advertising." *See* Docket No. 606.

ADAPTIVE'S MEMORANDUM REGARDING PRESENTATION OF DR. JOACHIMSTHALER'S DEPOSITION

entirety" of Dr. Joachimsthaler's "opinions at that time." *Adams v. U.S.*, No. 03-0049-E-BLW, 2009 WL 2413801, at *2 (D. Idaho Aug. 5, 2009).  Simply put, allowing Dr. Joachimsthaler's transcript to be read "without the benefit of [Adaptive's] participation in that same deposition through cross-examination" is unfairly prejudicial. *Id*.  Further, "while specific safeguards may be imposed as a prophylactic measure …, there still exists the risk of an improper perception lent in allowing" an expert to be called by deposition by a party that did not retain him. *Id*. (citing *Peterson v. Willie,* 81 F.3d 1033, 1037 (11th Cir. 1996) ("Jurors unfamiliar with the role of counsel in adversary proceedings might well assume that plaintiff's counsel had suppressed evidence which he had an obligation to offer.  Such a reaction could destroy counsel's credibility in the eyes of the jury.") (internal quotation omitted)).  "At the very least, such a circumstance may very well contribute to jury confusion under [Federal Rule of Evidence] 403." *Adams*, 2009 WL 2413801, at *2.

Adaptive respectfully requests that CI not be permitted to present either Adaptive's expert testimony by deposition or CI's rebuttal expert as part of its case-in-chief.

DATED:  December 20, 2010

VINCENT H. CHIEFFO (SBN: 49069)
GREENBERG TRAURIG LLP
2450 Colorado Ave., Ste. 400E
Santa Monica, CA  90404
Telephone: 310-586-7700
Facsimile: 310-586-7800
chieffov@gtlaw.com

JAMES H. DONOIAN (Admitted *pro hac vice*)
donoianj@gtlaw.com
GREENBERG TRAURIG LLP
200 Park Ave.
New York, NY  10166
Telephone: 212-801-9200
Facsimile: 212-801-6400

By:  */s/ Vincent H. Chieffo*
       Vincent H. Chieffo

Attorneys for Defendant and Counterclaimant
ADAPTIVE MARKETING LLC

# Exhibit A

<u>**JOACHIMSTHALER DIRECT  EXAMINATION  (BY DEPOSITION TAKEN 9/22/10)**</u>

<u>**4:2-4**</u>
ERICH JOACHIMSTHALER, having been duly sworn, was examined and testified as follows:

<u>**33:16-18**</u>
Q.   Do you agree that it's possible to build a brand around a URL?
A.   Yes, it's possible.

<u>**56:14 to 57:19**</u>
 Q.   Is FreeCreditReport.com a brand in your opinion?
A.   Based on the evidence that I have analyzed and has been provided to me and I have
been able to -- to find, I don't believe that FreeCreditReport is a brand.
 Q.   You just said FreeCreditReport.
A.   Dot com.
Q.   Do you have a conclusion as to whether FreeCreditReport.com is a brand?
A.   I said -- well, then, please add the ".com."  FreeCreditReport.com.
Q.   So you do not believe that FreeCreditReport.com is a brand?
A.   Based on the evidence that is provided to me, as the conclusion in my report says, I
have not found evidence that FreeCreditReport.com is a brand, strong brand.
Q.   Well, now you just said a strong brand so I just want to clarify.  I understand you have said
that your evidence has shown X or Y, but can you answer yes or no whether
FreeCreditReport.com is a brand?
A.   I can't answer really yes or no because it's -- I can't answer that yes or no.
Q.   Why is it that you can't answer yes or no?
A.   Because a brand is either strong or is weak, a brand is popular or not popular

<u>**74:9-13**</u>
Q.   Did you conduct any surveys in preparing your report?
A.   No.
Q.   Did you run any focus groups?
A.   No.

<u>**81:8-10**</u>
 Q.  Were you aware that there are NASCAR commercials?
A.   No.

<u>**82:14-16**</u>
Q.   Did you ask counsel for any documents
regarding marketing spend?
A.   No.

<u>**84:16-85:2**</u>
Q.    Did you, in preparing your report, did you review any data on user visits to the
FreeCreditReport.com website?

A.   No.
Q.   Do you know how many annual visitors FreeCreditReport.com receives?
A.   No.
 Q.   Do you know how many consumers enroll in credit monitoring through FreeCreditReport.com each year?
A.   No.

**87:23-88:12**
Q.   So what did you look at besides the complaint to learn about revenue data?
A.   Again, this is too long ago.  I really -- I usually looked at -- I don't know what I did at that time, really.  I don't remember, really, I don't remember.
Q.   Do you know whether counsel provided you with any documents on revenue data?
A.   To the best of my knowledge, I don't think the counsel provided me because it would have been in my file as I reviewed the case in the last couple of days.  I thought -- so I think it's -- that's how I remember it.

**89:5-10**
Q.   Do you have an understanding of whether FreeCreditReport.com has been profitable for ConsumerInfo?
A.   No.
Q.   You don't know one way or the other?
A.   No.

**93:12-22**
Q.   Do you know approximately how many customers they have?
A.   No.
Q.   And you have no understanding of the company's financial picture at all?
A.   No.  I don't -- as I said, at the beginning of this assignment I reviewed their business, the ownership of the company, I went through my analysis or my background of the size of this business, and I don't recall really those information right now.

**106:3-107:7**
Q.   "Awareness is generated through meaningful exposures to the brand.  This can be achieved, for example, through advertising such as TV, print or radio or other forms or channels such as social media."  Is that right?
A.   In the same paragraph -- yes.  Yes, I agree with that, yes.
Q.   Can awareness also be generated by sponsorships?
A.   Yes.
Q.   Then at paragraph 33 you say: "According to my analysis, there has been little awareness that has been created for the FreeCreditReport.com domain name as a brand or the elements of a brand."
A.   Yes.
Q.   Can you tell me the basis for your conclusion?
A.   I reviewed four market research studies that assessed in some form or the other awareness for the FreeCreditReport.com name.
Q.   That was Gallup and Simmons?

A.   Yes.
Q.   Anything else?
A.   No.
 Q.   So you are basing -- your conclusion is based solely on your review of the Gallup and Simmons data?
A.   Yes, in terms of awareness, yes.

**117:11-118:24**
Q.   So if you said singing pirate and credit reporting and then the consumer could say FreeCreditReport.com, that would be brand awareness?
A.   That would be one element that -- that one element that invokes the brand FreeCreditReport.com, yes.
 Q.   When you say I have not found any empirical evidence that provides support for high brand awareness, what types of empirical evidence is typically used in your field to evaluate brand awareness?
A.   Since awareness is one of the most fundamental elements of a brand, we tend to measure awareness in two ways.  One is recognition, and one is recall.  All brands measure recognition and recall.  It's some -- a very fundamental part of doing business, part of our research, so it's -- that's what would be my answer.
Q.   How is that determined, is that through surveys?
A.   Yes.
Q.   Is there any other form of evidence besides surveys for evaluating awareness?
A.   Yes.
Q.   What?
A.   In the course of my business, I would do things like focus groups.
Q.   Was there anything besides focus groups?
**A.   No.**
Q.   So social media would not be empirical?
A.   It's empirical research but not to measure awareness.
Q.   Not to measure awareness, okay.
A.   No.

**121:15-18**
Q.   But free press can be an important component of building awareness?
 A.   Yes, I think so.  It's a wonderful one.

**123:23-124:8**
Q.   Did you ask counsel if there had been any focus groups regarding FreeCreditReport.com?
A.   No.
Q.   Did you ask them if there were any other surveys besides Gallup and Simmons?
A.   Yes.
Q.   What did they tell you?
A.   Not that they knew -- I did not receive one but I'm sure I asked for it.

**152:6-152:16**
 Q.   So Exhibit 675, which also appears to have been previously marked as Exhibit 282, bears the Bates label AM000013948 through 13961 and it's titled:  Privacy matters, brand awareness research, final report June 2007. Can you take a look through this document, Doctor?
(Pause)
Q.   Doctor, have you ever seen this document before?
A.   No.

**153:6-8**
Q.   Were you aware that Adaptive conducted some market research in 2007?
A.   No.

**157:24-158:5**
Q.   I've just marked Exhibit 676.  It's Inside Express survey, Bates No. AM000008350 through 8487.  Can you turn to page 8352?  Have you seen this document before?
A.   No.

**158:13-15**
Q.   Were you aware that Adaptive conducted market research in the spring of 2009?
A.   No.

**168:15-23**
Q.   Exhibit 677 is Bates labeled AM000024344 through 24402.  It looks as though it's been previously marked as Plaintiff's Exhibit 283 and it's labeled:  Assessment of Ben Stein, Commercial Key Findings Report.  Can you take a look at this, Doctor?
A.   Okay.
Q.   Have you seen this document before?
A.   No.

**176:15-20**
Q.   And going back to Exhibit 676, which was -- 676 was the 2009 Inside Express, I believe?
A.   Oh, yes.
Q.   Is this a document you would have liked to have had in preparing your report?

**176:24-177:8**
A.   Yes, it would have -- I would have liked to have this document.
Q.   Going back to 675 which was -- that was the privacy matters brand awareness research final report June '07.
A.   Is that a document you would have liked to have had in preparing your report?
A.   Yes, I would have also liked this document because I like to have documents, yes.

**178:2-10**
Q.   Doctor, you've been handed Exhibit 678 and 679.  Exhibit 678 is a document labeled the Gallup organization, Experian Gallup personal financial credit index August 2005 proprietary top line, and Bates label is ECD_ES_00013863 through 69.  Exhibit 679 has a similar caption. It's dated August, 2006, and it's Bates No. ECD_ES_00013866 through 69.

**178:16-21**
Q.   Are you familiar with the Gallup organization, Doctor?
A.   Yes.
Q.   Do you consider them a reputable organization as far as conducting surveys?
A.   Yes.

**179:18-24**
Q.   I believe you stated that you had reviewed three Gallup surveys in your work on this matter, is that correct?
A.   Yes.
Q.   And you recall those to be August 2006, August 2005 and June 2005?
A.   Yes.

**181:15-17**
Q.   I'll just ask, is this empirical evidence of brand awareness of FreeCreditReport.com?

**181:19-21**
 A.   Yes, as I stated in my report, this is some evidence of awareness for FreeCreditReport.com.

**193:20-23**
Q.   Please turn on 682, Exhibit 682 is the Experian Simmons quarterly survey results June 2008 top line Bates No. ECD_ES_00051367 through 79.

**194:10-15**
Q.   You've seen this document before, correct, Doctor?
A.   Yes, yes, I did.
Q.   There is a survey underlying this document, correct?
A.   Yes.

**203:9-12**
Q.   Doctor, did you ask counsel for the details of FreeCreditReport.com's NASCAR involvement?
A.   No.

**206:2-17**
Q.  This is Bates labeled ECD-3556 and 5357.  These are depictions of a toy car modeled after the FreeCreditReport.com NASCAR vehicle.
Q.  Were you aware that a toy car was made, Doctor?

A.   No.
Q.   Are you aware that FreeCreditReport.com was a sponsor of the 2009
Orange County Susan Komen Race for the Cure?
A.   No.
Q.   Were you aware that a FreeCreditReport.com commercial appeared during
pregame for the 2003 Super Bowl?
A.   During the pregame?  No.
Q.   You were not aware of that?
A.   No.

**215:16-25**
Q.   Your basis for the statement that the band and commercials are successful in terms of
generating awareness for the band, there is very little link to FreeCreditReport.com is the
social media analysis, is that correct?
A.   Yes, that's correct.
Q.   The social media analysis is the Social Media Presence Evaluation, is that
correct?
A.   Yes.

**236:22-25**
Q.   Can you give me an example of a brand that actually built itself up using direct
response?
A.   Yes.  An example is Geico.

**256:20-23**
Q.   Were you aware that Ed McMahon was a spokesperson for FreeCreditReport.com?
A.   You know, I don't really remember.  I don't really remember.

**257:19 to 258:7**
Q.   You said you conducted the Facebook analysis for the purpose
of determining associations with the purported brand, is that right?
A.   Yes.
Q.   Could there be people who have associations with the brand who don't follow the
brand on Facebook?
A.   Yes.
Q.   Could there be people who have associations with the brand who aren't members
of Facebook?
A.   Oh, yes.

**258:11-15**
Q.   Could there be people with associations -- who have associations with the
brand who are on Facebook but do not decide to post regarding the brand?
A.   Oh, yes.
Q.   Could there be conversations about the brand occurring offline?
A.   Yes, absolutely.

**268:22-269:4**
Q.   Let's turn to page 22 of your report.  In paragraph 49 you say:  "Because the goal of direct response television tends not to focus on building the brand, most direct response television does not create a brand."  Then you cite the Tellis article for that?
A.   Yes.

**269:10-19**
Q.   Is Exhibit 690 the Tellis article that you cited?
A.   Yes.
Q.   Can you point me to what specifically in that article supports your conclusion?  Specifically?
A.   Specifically just take the headline: "Results of the analysis show that ads do stimulate direct response but their effects dissipate very rapidly."