UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES -- GENERAL

Case No.  **CV 09-3783-VBF(MANx)**                    Dated: **April 8, 2011**

Title:    Consumerinfo.com, Inc. -v- Alex Chang, et al.

---

PRESENT: HONORABLE VALERIE BAKER FAIRBANK, U.S. DISTRICT JUDGE

    Joseph Remigio                              None Present
    Courtroom Deputy                        Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS:      ATTORNEYS PRESENT FOR DEFENDANTS:

    None Present                                 None Present

**PROCEEDINGS (IN CHAMBERS):**     **MEMORANDUM OF DECISION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER COURT TRIAL (FED. R. CIV. P. 52(a)(1)); ORDER REGARDING FURTHER BRIEFING**

**I.  Summary Of Findings And Order Regarding Further Briefing**

After reading and considering the briefing and oral argument of the parties and after considering the evidence presented at the bench trial and during the jury trial relating to equitable issues, the Court finds the following:

1.  Defendants One Technologies, LP ("OTL") and Adaptive Marketing, LLC ("Adaptive") (collectively, "Defendants") have failed to carry their burden to show that Plaintiff ConsumerInfo.com, Inc.'s ("CI") statements to the U.S. Patent and Trademark Office and subsequent conduct estop CI from asserting its cybersquatting claims against Defendants.  Defendants have not shown that CI made statements to the USPTO that are inconsistent with the positions taken with respect to Defendants.

MINUTES FORM 90                          Initials of Deputy Clerk    jre
CIVIL - GEN

-1-

2. Defendants have failed to carry their burden to show that CI has waived its rights to pursue its cybersquatting claims against Defendants.

3. Defendants have failed to carry their burden to show that CI's cybersquatting claims against Defendants are barred by the doctrine of laches. The evidence demonstrates that there is a presumption that laches does not apply with respect to the cybersquatting claims at issue, and Defendants fail to overcome this presumption.

4. Defendants have failed to carry their burden to show that CI's cybersquatting claims against CI are barred by the doctrine of unclean hands.

5. Based on the factual findings of the jury with respect to the damages caused by Defendants' cybersquatting, judgment will be entered in the amount of $450,000 against Adaptive and $120,000 against OTL. An award based on the jury's determination of Defendants' profits would be excessive and inequitable.

6. CI has sufficiently shown that an injunction is warranted under 15 U.S.C. § 1116(a) for violation of CI's rights arising under § 1125(d). However, CI has not shown that the injunction should extend beyond the domain names that were the subject of its cybersquatting claims tried to the jury.

**The Court orders that no later than April 18, 2011, each party shall file a [Proposed] Judgment along with a brief no longer than 10 pages** supporting any item in the proposed judgment that is not explicitly supported by this order. The briefs should also address CI's requests (1) that the judgment include an award of costs to CI as the "prevailing party," and (2) that the judgment include an award of prejudgment interest to CI. The [Proposed] Judgment should follow the format of Dkt. 590 in No. CV 02-5497, *Quiksilver Inc. v. Kymsta Corp.*, *et al*. (C.D. Cal.).

As the Court has already considered the parties' proposed injunctions and objections to competing proposed injunctions (*see* dkts. 780, 786-90), no further briefing is required on the scope of the injunction.

Once the parties have submitted their briefs, the Court will enter a judgment and permanent injunctions in accordance with this order.

MINUTES FORM 90                                      Initials of Deputy Clerk   ___jre___
CIVIL - GEN

**II. Estoppel**

The Court finds that Defendants OTL and Adaptive have failed to carry their burden to prove estoppel. To establish a defense of estoppel, Defendants must prove that: (1) CI knew of the underlying relevant facts; (2) CI intended its conduct to be acted on or acted such that Defendants had a right to believe CI so intended; (3) Defendants were ignorant of the true relevant facts; and (4) Defendants relied on CI's conduct to their own injury. *See California State Bd. of Equalization v. Coast Radio Products*, 228 F.2d 520, 525 (9th Cir. 1955).

The basis of Adaptive and OTL's claims of estoppel are CI's representations to the PTO made in support of CI's assertions that FREECREDITREPORT.COM was not confusingly similar to CREDITREPORTS.COM. Although Defendants attempt to use CI's statements to the PTO to estop CI from contending that the Accused Domains[1] are confusingly similar to FREECREDITREPORT.COM, the representations made to the PTO do not support Defendants' claims of estoppel. Defendants claims of estoppel rest on their showing an inconsistency between CI's statements made to the PTO and CI's positions taken with respect to Defendants, but Defendants have failed to do so. *See Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 632 (9th Cir. 2007) (in context of judicial estoppel, a later position must be "clearly inconsistent" it the earlier position); *see also Freedom Card, Inc. v. J.P. Morgan Chase & Co.*, 432 F.3d 463, 476 (prior inconsistent statements may undermine a claim of likelihood of confusion).

---

[1] The eight OTL domain names subject to the jury's cybersquatting verdict are: 2008freecreditreport.com, 2009freecreditreport.com, 2010freecreditreport.com, 2010freecreditreports.com, freecreditreports2010.com, 800freecreditreports.com, freecreditreportssite.com and freecreditreportwebsite.com. *See* dkt. 786-1 ¶ 8. The thirteen Adaptive domain names subject to the jury's cybersquatting verdict are: freetriplecreditreport.com, freecreditreport2009.com, freecreditreport2010.com, freecreditreport2011.com, freecreditreport2012.com, freecreditreport2013.com, freecreditreport2014.com, freecreditreport2015.com, freecreditreport2016.com, freecreditreport2017.com, freecreditreport2018.com, freecreditreport2019.com, and freecreditreport2020.com. *See* dkt. 788-1 ¶ 9. Collectively, these twenty-one domain names are referred to as the "Accused Domains."

| MINUTES FORM 90 | Initials of Deputy Clerk ___jre___ |
|---|---|
| CIVIL - GEN | |

First, as CI contends, CI did not make a general assertion that domains with all three terms "free," "credit," and "report" could peacefully coexist; instead CI stated that its mark was distinct from CREDITREPORTS.COM because "while each includes the term CREDITREPORT, [they] are sufficiently different as a whole in sight, sound and meaning to show that no likelihood of confusion exists. Applicant's mark includes the word FREE before CREDITREPORT, and CREDITREPORT is in the singular, while the Cited Mark is plural and without the term FREE, distinguishing it in appearance, recognition and pronounciation of the cited mark." *See* Faud Decl. Ex. 14 (Tr. Ex. 512) at ECD 38247-48. The Accused Domains include all three of terms "free," "credit," and "report," and thus Defendants do not show that CI's statements to the PTO are inconsistent with their positions in this action.

Second, although CI argued to the PTO that CREDITREPORTS.COM was weak and that CREDITREPORTS.COM had co-existed peacefully with marks that contained the words "Credit Report," CI did not make a statement that FREECREDITREPORT.COM could peacefully coexist with company names and registered domains that contained all three of "free," "credit," and "report." *See* Tr. Ex. 512 ECD 38250-51 & Ex. 7 ("[T]he phrase CREDIT REPORT also is commonly used as an unregistered mark or name for other goods and services. Applicant's mark has in no way affected the ease with which the public is currently able to distinguish between various marks incorporating the phrase CREDIT REPORT. If there is no confusion between all of the above-reverenced marks, Applicant's mark certainly will not cause a likelihood of confusion with the Cited Mark.").

Third, in light of the evidence that FREECREDITREPORT.COM as a whole is a strong mark (*see, e.g.,* Dkt. 722 § D.1) and CI's assertions that CREDITREPORTS.COM was a weak mark, Defendants do not show an inconsistency in CI's taking the position that the Accused Domains are likely to be confused with FREECREDITREPORT.COM. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979) (likelihood of confusion evaluated in light of the "strength of the mark").

OTL also asserts that its claims of estoppel are supported by the facts that (1) at least since 2005 CI knew that OTL used the domain names OfficialFreeCreditReport.com and FreeCreditReportsInstantly.com, (2) at least since 2008 CI knew that OTL used FreeCeditReports360.com, (3) when CI sent a cease and desist letter to OTL in 2006, CI made no claim that any OTL domain name was confusingly similar to FREECREDITREPORT.COM, (4) when CI sent a cease and desist letter to OTL in 2008, CI only claimed that MyFreeCreditReport.com was confusingly similar, and (5) CI made no follow-up efforts. OTL Brief (dkt. 746) at 11:6-12:12. First, these contentions are more properly analyzed under the defense of laches rather

MINUTES FORM 90                           Initials of Deputy Clerk ___jre___
CIVIL - GEN

than estoppel, since the contentions rely on CI's purported delay in action rather than a "concealment or false representation [that] intentionally deceives another party as to the true state of the facts to the detriment of the second party." *Cal. State Bd.*, 228 F.2d at 525; *see also Brookfield Commc'ns v. West Coast Entm't Corp.*, 174 F.3d 1036, 1061 (9th Cir. 1999) (applying elements of laches to claim that a party should be "estopped" from asserting its trademark rights due to delay in enforcement); Section IV, below.  Second, the facts cited by OTL are insufficient to support OTL's claims of estoppel because none of the above four domain names are included in the Accused Domains, and also because there is insufficient evidence for the Court to conclude that CI's lack of immediate action against OTL regarding the four domains listed above gave OTL the right to believe that CI would not consider the Accused Domains to be confusingly similar to FREECREDITREPORT.COM.  *See* Dec. 15 a.m. Tran. (Henry), 48:24-50:6; Exs. 66, 447.

In sum, Defendants have not sufficiently shown the elements of estoppel, namely that (1) CI knew of the underlying facts (i.e., either that FREECREDITREPORT.COM and the Accused Domains *were* confusingly similar, or that CI *believed* them to be confusingly similar), (2) CI acted in a way such that Defendants had a right to believe that FREECREDITREPORT.COM and the Accused Domains were not confusingly similar or that CI believed them not to be confusingly similar, (3) Defendants were ignorant that FREECREDITREPORT.COM and the Accused Domains were confusingly similar or that CI believed them to be confusingly similar, and (4) that Defendants relied on CI's conduct to their own injury.

### III. Waiver

The Court finds that Defendants OTL and Adaptive have failed to carry their burden to prove waiver.  "Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it."  *U.S. v. King Features Entertainment, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988).  Waiver may also be found where a "party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished."  *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1559 (9th Cir. 1991).

Adaptive contends that CI's representations to the PTO signaled to any reasonable observer the limits of CI's intent to exclude other uses, but as stated above in Section II, Adaptive has not shown that CI's representations to the PTO are inconsistent with its positions taken against Adaptive.  Adaptive also contends that CI's prior enforcement activities confirmed CI's intent to limit the uses CI would exclude because CI targeted people who used domain names differing from

MINUTES FORM 90                              Initials of Deputy Clerk    jre
CIVIL - GEN

FREECREDITREPORT.COM only by a single character.  *See* Donoian Decl, Ex. H (Dec. 28 a.m. Tran. (Dean), 50:21-51:7); Tr. Ex. 1053 ¶ 27.  However, this evidence does not show that CI intended to relinquish its rights to enforce its FREECREDITREPORT.COM mark against domains that differ from FREECREDITREPORT.COM to a greater extent, and are not inconsistent with CI's enforcement against the Accused Domains.

OTL contends that CI has known about OTL's domain names conduct, including the Accused Domains and other similar domains, for nearly a decade, and that not once prior to this lawsuit did CI ever suggest to OTL that its ownership and use of the Accused Domains might be cybersquatting.  However, as CI contends, CI has brought three Federal lawsuits to enforce its rights in FREECREDITREPORT.COM, applied for a trademark registration, and sent cease and desist letters.  *See* Dec. 21 a.m. Tran. (Taylor), 48:8-18; Dec. 28 Tran. (Dean) 49:8-51:7; Dec. 21 p.m. Tran. (Williams)_63:19-66:6; Tr. Exs. 1058, 3180, 3187, 3199.

In sum, Defendants have not shown that CI intentionally relinquished rights in FREECREDITREPORT.COM, or acted so inconsistently with an intent to enforce its rights so as to induce a reasonable belief that CI's rights had been relinquished.

**IV.   Laches**

The Court finds that Defendants OTL and Adaptive have failed to carry their burden to prove laches.  Each Defendant is required to prove (1) that CI's delay in bringing suit was unreasonable; and (2) that the Defendant was prejudiced by the delay.  *See Internet Specialties West, Inc. v. Milon-DiGiogio Enterprises, inc.*, 559 F.3d 985, 990 (9th Cir. 2009).

Generally speaking, the relevant delay is the period from when CI knew or should have known of Defendants' allegedly infringing conduct, until the initiation of the lawsuit.  *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir. 2001).  If a lawsuit is brought within the most analogous state law statute of limitations (in this case four years), the strong presumption is that laches is inapplicable.  *See Internet Specialties*, 559 F.3d at 990 & n.2.  To determine whether delay in filing suit was unreasonable, courts consider (1) the strength and value of the trademark rights asserted; (2) plaintiff's diligence in enforcing the mark; (3) harm to the senior user if relief is denied; (4) good faith ignorance by junior user; (5) competition between senior and junior user; and (6) extent of harm suffered by junior user because of senior user's delay.  *E-Systems, Inc. v. Monitek, Inc.*, 720 F.2d 604, 607 (9th Cir. 1983).

MINUTES FORM 90                              Initials of Deputy Clerk    jre
CIVIL - GEN

Adaptive registered all but three of its Accused Domains (freecreditreport2011.com through freecreditreport2020.com) in March of 2009, about two months before the filing of the lawsuit.  *See* Tr. Ex. 228, 2084.  Adaptive registered freecreditreport2009.com and freecreditreport2008.com in April 2008, about thirteen months before the filing of the lawsuit.  *Id.*  Adaptive registered the remaining domain, freetriplecreditreport.com, in May 2006, did not begin promoting it or using it until April 2008, and received a cease and desist letter regarding Adaptive's use of the domain in December, 2008.  *See* Tr. Exs. 318, 1048, 3180.  Considering the *E-Systems* factors, Adaptive fails to overcome the presumption that laches is inapplicable: (1) the jury found that FREECREDITREPORT.COM is a famous trademark; (2) CI sent its cease and desist letter within eight months of Adaptive's use of the Accused Domains and filed suit within thirteen months, and thus was reasonably diligent in enforcing its mark; (3) the jury found that Adaptive's cybersquatting caused $450,000 in damage to CI; (4) the jury found that Adaptive cybersquatted with a bad faith intent to profit; (5) Adaptive is in competition with CI; and (6) Adaptive has not built significant business around freecreditreport2009.com through freecreditreport2020.com, and has not built brand awareness around freetriplecreditreport.com and has ceased promoting it in early 2010. *See* dkt. 722, Tr. Ex. 3280, 319; Dec. 29 Tran. (Huntting), 100:16-101:22, Tr. Ex. 192; Dec. 16 a.m. Tran. (Douglas), 61:4-11; Tr. Ex. 318.

OTL contends that CI knew as early as 2001 about OTL domain names other than OTL's Accused Domains that included "free," "credit," and "report," yet did not complain until this lawsuit.  However, this knowledge and delay is insufficient for OTL to carry its burden to show laches.  OTL does not sufficiently show that CI knew about OTL's use of the Accused Domains at issue and delayed suit on those names for an unreasonably long period of time.  In addition, any use by OTL of CI's marks from 2001 through January 2006, and from December 2007 through spring 2009 (*see* OTL Brief (dkt. 746) at 3:8-14), would have inured to the benefit of CI in light of the contractual affiliate marketing relationship between the parties.  *See Watec Co. v. Liu*, 402 F.3d 645, 654 (9th Cir. 2005).

OTL registered the bulk of OTL's Accused Domains in April and May of 2008, approximately twelve or thirteen months before filing suit.  Dec. 14 Tran. (Moore), 115:12-121:3; Tr. Exs. 19, 155, 3843.  The remaining Accused Domain, freecreditreportwebsite.com, was registered in April 2005.  Ex. 14.  However, there is insufficient evidence that OTL used freecreditreportwebsite.com in a way contrary to CI's rights prior to the laches period or that CI knew of such use, especially in light of the affiliate relationship in effect before January 2006.  *See* Tr. Ex. 325.

| MINUTES FORM 90 | Initials of Deputy Clerk ___jre___ |
|---|---|
| CIVIL - GEN | |

Instead, the weight of the evidence shows that the OTL's Accused Domains were used contrary to CI's rights only after April or May 2008. *See* Dec. 14 Tran. (Moore), 115:12-121:3; Tr. Ex. 325. Considering the *E-Systems* factors, OTL fails to overcome the presumption that laches is inapplicable: (1) the jury found that FREECREDITREPORT.COM is a famous trademark; (2) CI filed suit within thirteen months of OTL's use of the Accused Domains and thus was reasonably diligent in enforcing its mark; (3) the jury found that OTL's cybersquatting caused $120,000 in damage to CI; (4) the jury found that OTL cybersquatted with a bad faith intent to profit; (5) OTL is in competition with CI; and (6) OTL does not treat the Accused Domains as trademarks, has not spent a significant amount in marketing them, and no longer uses the terms "free credit report" in its advertising. *See* dkt. 722; Dec. 15 p.m. Tran. (Henry), 13:24-14:3, 46:2-10; Dec. 14 Tran. (Moore), 121:21-22; Ex. 325.

**V.   Unclean Hands**

The Court finds that Defendant OTL fails to carry its burden to prove unclean hands. Defendant Adaptive does not assert this defense. To establish an unclean hands defense, OTL must prove: (1) CI's conduct is inequitable, and (2) the conduct relates to the subject matter of its claims. *Japan Telecom, Inc. v. Japan Telecom America Inc.*, 287 F.3d 866, 869 (9th Cir. 2002). The doctrine should be applied "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *TrafficSchool.com, Inc. v. Edriver, Inc.*, 633 F. Supp. 2d 1063, 1083-84 (C.D. Cal. 2008) (quoting *U-Haul Int's, Inc. v. Jartran, Inc.*, 522 F. Supp. 1238, 1255 (D. Ariz. 1981).

OTL contends that CI has unclean hands because CI itself owns thousands of domain names, including the domain name CreditReport.com, which differs by only a single letter from CREDITREPORTS.COM, a registered trademark of a competitor. However, OTL fails to show that CI's actions are inequitable or unconscionable because there is insufficient evidence (1) of the validity and strength of CREDITREPORTS.COM, which is registered on the supplemental register; and (2) that CI has used CreditReport.com with a bad faith intent to profit from the mark CREDITREPORTS.COM, as would be required to hold CI liable for cybersquatting. *See* OTL's Request for Judicial Notice (dkt. 748-1) Ex. C); 15 U.S.C. § 1125(d). OTL also fails to show that CI's conduct sufficiently relates to the subject matter of CI's claims because the alleged conduct does not suggest that CI dirtied its hands in acquiring the rights it now asserts. *See People for Ethical Treatment of Animals, Inc. v. Doughney*, 113 F. Supp. 2d 915, 921 (E.D. Va. 2000). OTL also attempts to rely on CI's representations to the PTO, but as addressed

MINUTES FORM 90                                  Initials of Deputy Clerk ___jre___
CIVIL - GEN

above in Section II, the Court does not find that CI took inconsistent positions.

**VI.  Monetary Relief**

The Court determines that based on the factual findings of the jury, judgment will entered in the amount of $450,000 against Adaptive and $120,000 against OTL.[2]  This determination is without prejudice to the parties' right to seek to amend these awards through post-judgment motions, as appropriate.

"When . . . a violation under section 1125(a) or (d) of this title . . . shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."  *Id*.  Additionally, the amount awarded "shall constitute compensation and not a penalty."  *Id*.

Here, the jury determined that Adaptive's cybersquatting caused $450,000 in damage to CI, and that OTL's cybersquatting caused $120,000 in damage to CI.  The jury also determined that Adaptive received $1,050,000 in profits attributable its cybersquatting and that OTL received $280,000 in profits attributable to its cybersquatting.  Dkt. 722.  In general, the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations when determining equitable issues based on the same facts.  *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993).  In addition, while § 1117 allows the Court to adjust an award of defendant's profits upward or downward, it "does not allow for a downward adjustment of actual damages."  *Go Med. Indus. Pty., Ltd. v. Inmed Corp.*, 471 F.3d 1264, 1274 (Fed. Cir. 2006).

The Court determines that an award of both damages to CI and Defendants' profits would constitute an impermissible double recovery. *See Nintendo of America, Inc. v. Dargon Pacific Intern.*, 40 F.3d 1007, 1010 (9th Cir. 1994) ("[T]he recovery of both plaintiff's lost profits

---

[2]In light of this determination, the Court need not address OTL's assertion that CI's damages against it are contractually limited to no more than $130,952.78.  *See* OTL's Brief (dkt. 746) at 22:12-24:21.

MINUTES FORM 90                                Initials of Deputy Clerk    jre
CIVIL - GEN

and disgorgement of defendant's profits is generally considered a double recovery under the Lanham Act."). The same underlying transactions were used by CI's expert Mr. Nolte to calculate both CI's damages and Defendants' unjust enrichment. *See* Dec. 22 p.m. Tran. (Nolte) at 40:22-41:6.

The Court determines that a recovery based on Defendants' profits as found by the jury is excessive, and that CI's recovery should be based on the damage it suffered due to Defendants' cybersquatting. As to OTL, the weight of the evidence suggests that OTL's profit from its use of the Accused Domains amounted to no more than $10,000. *See* Dec. 22 p.m. Tran. (Nolte) at 40:22-41:6 (OTL's use of the Accused Domains "generated $25,159" in revenue) and 63:16-64:3 (OTL's incremental profits pertaining to the Accused Domains was $10,000). As to Adaptive, the method of determining OTL's profit was highly speculative. *See Lindy Pen Co., Inc.v v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993) ("Many courts have denied a monetary award in infringement cases when damages are remote and speculative."). Mr. Nolte accepted the quantity of sales transactions in a document produced by Adaptive at face value, but disregarded Adaptive's costs reflected in the same document and instead applied *CI's* profit margin to Adaptive's revenues. Jan. 4, 2011 Tran. (Inglish), 99:9-15; Dec. 22, 2010 Tran. (Nolte) 66:13-24. This results in a speculative calculation in light of Mr. Nolte's implicit assumptions that (i) CI's product mix, features, and pricing were comparable to those on Adaptive's sites that used the Accused Domains; (ii) that Adaptive's cost structure is similar to CI's; and (iii) that Adaptive had the same level of sophistication in paid search marketing as did CI. Jan. 4, 2011 Tran. (Inglish), 102:3-20.

The Court determines that a monetary judgment based on damage to CI is appropriate in this case after balancing the equitable consideration of making infringements unprofitable with the competing equitable consideration of avoiding a windfall judgment. *See Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1274 (9th Cir. 1982); *Trafficschool.com*, 633 F. Supp. 2d at 1087. This determination is made in light of (1) the strength of the evidence supporting the jury's finding of Defendants' unjust enrichment; (2) the existence of the jury's award based on CI's damages, and (3) the injunctive relief that will be awarded to CI (*see* Section VII, below).

**VII. Injunctive Relief**

The Court finds that CI is entitled to injunctive relief as described in this section. Under the Lanham Act, district courts "shall have power to grant injunctions, according to the principles of equity

and upon such terms as the court may deem reasonable, . . . to prevent a violation under [section 1125(d)]." 15 U.S.C. § 1116. Before a court may grant such relief, a plaintiff must demonstrate (1) that is has suffered an irreparable injury; (2) that remedies available at law are inadequate; (3) that the balance of hardships between the plaintiff and defendant warrant a remedy in equity; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Here, the jury's finding that FREECREDITREPORT.COM is a valid and famous trademark indicates that CI has established goodwill in the trademark, and the jury's finding of damages indicates that CI's goodwill has been damaged by Defendants' capturing sales intended for CI through use of the Accused Domains. *See* dkt. 722; *see also* Dec. 22 a.m. Tran. (Scott), 41:16-42:16. Thus, CI has sufficiently shown irreparable injury.

CI sufficiently shows that remedies at law are inadequate, as an award solely of monetary damages would permit Defendants to retain the domain names that the jury found were registered or used in bad faith and thus hinder CI's ability to control the use of its mark and profit from its goodwill. *See* dkt. 722.

CI sufficiently shows that the balance of hardships between itself and Defendants warrant a remedy in equity. As found in Section IV, CI has a strong interest in maintaining sole control over its FREECREDITREPORT.COM mark, while Defendants have significantly weaker interests in maintaining ownership of the Accused Domains.

CI sufficiently shows that the public interest would not be disserved by a permanent injunction with respect to the Accused Domains. A jury has found that Defendants registered the domains in bad faith, and that they were confusingly similar to CI's mark. *See* dkt. 722.

However, CI has not shown that the injunction should extend to all domain names "identical, confusingly similar to or dilutive of the FREECREDITREPORT.COM mark." *See* CI's [Proposed] Permanent Injunction (dkt. 780) at 2:27-28; 3:11-12; 3:23-24; 4:12-13. First, this definition does not sufficiently take into account the requirement of "bad faith intent to profit" from a mark, which is necessary for the use of a domain to constitute a cybersquatting violation. *See* 15 U.S.C. § 1125(d). Second, the scope of CI's requested order may sweep in Defendants' domain names that were more susceptible to a laches defense, and that CI chose not to include in the claims prosecuted at trial. Third, CI's proposed injunction is overbroad and too vague, in that it would not provide

sufficient guidance to the parties enjoined considering the circumstances of this litigation. Instead, as Defendants contend, the equitable relief should be limited to a prohibition against further use of the Accused Domains and a transfer of the Accused Domains from Defendants to CI. *See* dkts. 786-1; 788-1; *see also* 15 U.S.C. § 1125(d)(1)(C) (permitting order of cancellation or transfer of domain names).

The Court finds that modified versions of the [Proposed] Permanent Injunctions submitted by Defendants (dkt. 786-1; 788-1) are appropriate. In the final judgment, the Court will enter an injunction that orders the following:

> 1. Adaptive, together with its officers, directors, agents, servants, employees and attorneys, and other persons who are in active concert or participation with Adaptive, are hereby enjoined and restrained from further registering, trafficking in or otherwise using the following domain names: freetriplecreditreport.com, freecreditreport2009.com, freecreditreport2010.com, freecreditreport2011.com, freecreditreport2012.com, freecreditreport2013.com, freecreditreport2014.com, freecreditreport2015.com, freecreditreport2016.com, freecreditreport2017.com, freecreditreport2018.com, freecreditreport2019.com, and freecreditreport2020.com.
>
> 2. Adaptive, together with its officers, directors, agents, servants, employees and attorneys, and other persons who are in active concert or participation with Adaptive, are hereby ordered, to the extent possible and to the extent they maintain any rights, title and interest in the following domains (1) to relinquish all rights, title and interest in the following domain names: freetriplecreditreport.com, freecreditreport2009.com, freecreditreport2010.com, freecreditreport2011.com, freecreditreport2012.com, freecreditreport2013.com, freecreditreport2014.com, freecreditreport2015.com, freecreditreport2016.com, freecreditreport2017.com, freecreditreport2018.com, freecreditreport2019.com, and freecreditreport2020.com; and (2) to transfer all domains listed in this paragraph to CI or its authorized representative within fourteen (14) days of entry of this permanent injunction.
>
> 3. OTL, together with its officers, directors, agents, servants, employees and attorneys, and other persons who

are in active concert or participation with OTL, are hereby enjoined and restrained from further registering, trafficking in or otherwise using the following domain names: 2008freecreditreport.com, 2009freecreditreport.com, 2010freecreditreport.com, 2010freecreditreports.com, freecreditreports2010.com, 800freecreditreports.com, freecreditreportssite.com and freecreditreportwebsite.com.

4. OTL, together with its officers, directors, agents, servants, employees and attorneys, and other persons who are in active concert or participation with OTL, are hereby ordered, to the extent possible and to the extent they maintain any rights, title and interest in the following domains (1) to relinquish all rights, title and interest in the following domain names: 2008freecreditreport.com, 2009freecreditreport.com, 2010freecreditreport.com, 2010freecreditreports.com, freecreditreports2010.com, 800freecreditreports.com, freecreditreportssite.com and freecreditreportwebsite.com; and (2) to transfer all domains listed in this paragraph to CI or its authorized representative within fourteen (14) days of entry of this permanent injunction.

5. The registrar or registrars of record are hereby authorized to transfer the aforementioned domains to CI or its authorized representative at CI's request accompanied by a copy of this permanent injunction.

**VIII.    Findings Of Fact And Conclusions Of Law**

With certain modifications set forth herein, the Court agrees with and adopts ConsumerInfo.com, Inc.'s [Proposed] Findings of Fact and Conclusions of Law re Equitable Issues (dkt. 755-1). These Findings of Fact and Conclusions of Law are a supplement to the court's findings set forth above in its memorandum decision.

   **A.    Findings Of Fact**

1.   This lawsuit was filed on May 28, 2009.

2.   Defendants have cybersquatted with a bad faith intent to profit from CI's trademark, FREECREDITREPORT.COM.

3.   Defendants' cybersquatting caused CI damage.

MINUTES FORM 90                          Initials of Deputy Clerk ___jre___
CIVIL - GEN

4.     Neither Defendant began actively promoting the Accused Domains until June 2008 as to OTL and April 2008 as to Adaptive.

5.     OTL registered the bulk of the infringing domains in April and May of 2008.

6.     The remaining OTL domain, freecreditreportwebsite.com, was registered in April 2005.

7.     At the time freecredireportwebsite.com domain was registered, however, OTL was bound exclusively to promote CI's products under contract.  This exclusive relationship continued until CI terminated the contract, effective January 2006.

8.     There is insufficient evidence to find that OTL used freecreditreportwebsite.com in a way contrary to CI's rights prior to the statutory limitations period.

9.     OTL presented insufficient evidence that it used variations of FREECREDITREPORT.COM to drive traffic to competitors of CI prior to the termination of the exclusive marketing agreement in January 2006.

10.    Adaptive registered all but three of its Accused Domains in March of 2009.

11.    Adaptive registered freecreditreport2009.com and freecreditreport2008.com in April of 2008.

12.    Adaptive registered the remaining domain, freetriplecreditreport.com, in May 2006, but did not begin using it in a bad faith way against CI until April 2008, thirteen months before the filing of the lawsuit.

13.    OTL's President, Mark Henry, testified that OTL treats its domains as "just a generic set of keywords . . . . not a trademark."

14.    Brandon Moore testified that "[w]e haven't used these domain names in any advertising at all."

15.    OTL spent only $7,862.77 in combined product and marketing costs for the Accused Domains.

16.    Since early 2010 OTL no longer actively uses the terms "free credit report" in its advertising.


MINUTES FORM 90                          Initials of Deputy Clerk    jre
CIVIL - GEN

17.     The freecreditreport2009.com through freecreditreport2020.com domain names generated only 99 base sales for $5,267 total in revenue before Adaptive ceased the project.

18.     There were never any television commercials for freetriplecreditreport.com.

19.     Adaptive's Vice President of Marketing stated that Adaptive was "not taking a branding approach" to its marketing due to the fact that "the finance group was not giving [him] sufficient funding . . . to take a branding approach."  Adaptive ceased promoting freetriplecreditreport.com in early 2010 for reasons unrelated to the lawsuit.

20.     Adaptive has failed prove it built significant brand awareness for freetriplecreditreport.com or the remaining Accused Domains.

21.     Therefore, Defendants' did not show they have developed significant business around the publicity of the Accused Domains.

22.     CI sued Mighty Net for infringement of FREECREDITREPORT.COM in March of 2006.

23.     CI sent cease and desist letters to numerous competitors infringing the FREECREDITREPORT.COM mark, including Defendants in this case.

24.     CI sued Jesse Willms for infringement in January 2009.

25.     CI worked with the search engines to prevent infringement of its mark.

26.     The jury found that Defendants cybersquatted with a bad faith intent to profit from FREECREDITREPORT.COM.

27.     The jury found that FREECREDITREPORT.COM is a famous trademark.

28.     CI spends $140 million to $150 million a year on advertising, has acquired a total of 80 million customers, is the subject of pop-cultural references and is discussed widely in the media and in spoofs.

29.     At present, FREECREDITREPORT.COM accounts for 50% of sales and 60% to 70% of CI's revenues.

30. The jury found that Adaptive's cybersquatting damaged CI in the amount of $450,000, and OTL's cybersquatting damaged CI in the amount of $120,000.

31. Defendants are in competition with CI.

32. There is insufficient evidence that CI made a false statement to the Defendants, or intentionally concealed from Defendants that CI would seek to enforce its trademark rights against them. Nor is there sufficient evidence that Defendants were unaware that CI asserted trademark rights in FREECREDITREPORT.COM or that Defendants reasonably relied to their detriment on a mistaken belief that CI did not believe it had trademark rights in FREECREDITREPORT.COM.

33. CI applied publicly for a trademark registration for FREECREDITREPORT.COM in February of 2006.

34. When terminating its original contract with OTL, CI expressly told OTL to remove all reference to FreeCreditReport.com on its sites in order to protect CI's "valuable rights."

35. OTL knew as early as 2005 that Yahoo kicked off OTL's keyword listings because of CI's efforts to protect its trademark rights.

36. Adaptive employees debated whether their domains were too close to FREECREDITREPORT.COM and whether CI would be likely to sue them.

37. CI made no assertion to the USPTO that domains with all three terms "free," "credit," and "report" could peacefully coexist: instead it stated that its mark was distinct from the mark CREDITREPORTS.COM because "while each includes the term CREDITREPORT, [they] are sufficiently different as a whole in sight, sound and meaning to show that no likelihood of confusion exists. Applicant's mark includes the word FREE before CREDITREPORT, and CREDITREPORT is in the singular, while the Cited Mark is plural and without the term FREE, distinguishing it in appearance, recognition and pronounciation of the cited mark."

38. All of Defendants' Accused Domains contain the word "free."

39. CI told the USPTO that the CREDITREPORTS.COM mark was weak and CREDITREPORTS.COM had co-existed peacefully with marks that contained the words "Credit Report."

40. The jury found that the Accused Domains were confusingly similar to FREECREDITREPORT.COM, and that there was not clear and convincing evidence that CI made a false representation to the PTO regarding a material fact.

40. The jury found that FREECREDITREPORT.COM is a valid and protectable mark, and not generic.

41. As a result of Defendant's failure to build a business based around the publicity of the Accused Domains, Defendants will not suffer significant hardship from an injunction against cybersquatting.

42. CI presently derives about 50% of its sales and 60-75% of its revenues from FREECREDITREPORT.COM.

43. Adaptive currently uses freetriplecreditreport.com to redirect to freetriplecreditscore.com.

44. Money damages cannot adequately compensate CI for the damage to its goodwill that OTL and Adaptive have caused and will continue to cause if not enjoined.

45. Allowing Defendants to retain the Accused Domains that the jury found were registered or used in bad faith would irreparably injure CI by capturing sales intended for CI and would harm the goodwill that CI has built up in FREECREDITREPORT.COM.

### B. Conclusions Of Law

1. Any of the following conclusions of law that are deemed to constitute findings of fact are hereby incorporated as findings of fact.

2. As set forth above, CI's cybersquatting claims with respect to the Accused Domains are not barred against either Adaptive or OTL by the affirmative defense of estoppel.

3. As set forth above, CI's cybersquatting claims with respect to the Accused Domains are not barred against either Adaptive or OTL by the affirmative defense of waiver.

4. As set forth above, CI's cybersquatting claims with respect to the Accused Domains are not barred against either Adaptive or OTL by the affirmative defense of laches.

5.   As set forth above, CI's cybersquatting claims with respect to the Accused Domains are not barred against either Adaptive or OTL by the affirmative defense of unclean hands.

6.   Defendants OTL and Adaptive are liable to CI for cybersquatting with respect to the Accused Domains under 15 U.S.C. § 1125(d).

7.   CI has suffered irreparable injury to the goodwill associated with FREECREDITREPORT.COM.

8.   CI's remedies at law are inadequate because without an injunction, Defendants would continue to use domain names are likely to confuse consumers and divert them to Defendants' competing businesses.

9.   The balance of hardships between CI and Defendants warrants a remedy in equity because CI has invested large amounts of money into the FREECREDITREPORT.COM trademark, while Defendants have not built a business based around the publicity of the Accused Domains.

10.  The public interest would not be disserved by a permanent injunction because trademark law protects the public's interest in not being confused by the registration or use of confusingly similar domains.

11.  A reasonable injunction would not extend to all domains that are "identical, confusingly similar to or dilutive of the FREECREDITREPORT.COM mark."  Instead, a reasonable injunction would be limited to the Accused Domains that were the subject of trial in this action.

Date:  April 8, 2011        _____
                             Honorable Valerie Baker Fairbank
                             United States District Judge